and United States v. Cedric Cromwell. At this time, would counsel for the Appellant Cross Appellee Dequattro please introduce himself on the record to begin? Thank you, Mr. Toomey, and good morning, your honors. I'm Martin Weinberg on behalf of Appellant David Dequattro. I'd like to begin by saying that I'm very pleased to be here today, and I'm very pleased to have the opportunity to speak on behalf of the Appellant Cross Appellee Dequattro. And I would ask whether or not I could save three minutes for rebuttal. You may. The requirement of proof beyond a reasonable doubt is a central safeguard to prevent the conviction of an innocent man for a crime he did not commit. We strongly urge this court to reverse the convictions of Mr. Dequattro on count five of the underlying indictment for three central reasons. First, there was no adequate proof of corrupt intent. Two, there was no adequate proof that two gifts that were the subject of the count five conviction, a $1,700 piece of used Bowflex gym equipment under $1,900 and a hotel suite gift, were given in exchange for a promise of an official act by Mr. Cromwell, in this case the government. Theory was that that promise was to protect a contract that Mr. Dequattro's business, RGV, had with the gaming authority of the Mashpee Tribe. And third, because a jurisdictional element was inadequately proven by the government, that being the requirement of some unity between the entity that received over $10,000 in federal benefits and the entity that engaged in a business transaction that was imperiled by the allegations of corruption. In terms of direct evidence that these gifts were in exchange for any promise to protect the contract, there simply was none. If we were to rule on a jurisdictional element, that would suffice to resolve this count entirely? It would, Your Honor. It's an essential element, and it comes with a unique set of facts, if I could direct myself for several minutes to the jurisdictional issue, which is that the only entity that received federal benefits was the Mashpee Tribe. The Mashpee Tribe, through an ordinance, set out a legally separate entity that was the Mashpee Gaming Authority. Is there some legal reason to have established that? Was there a statutory reason in the Indian Gaming Act that required the authority to be established, or was that purely for purposes of just organizing the finances of the tribe? Well, the evidence from the Gaming Authority treasurer, who was also the treasurer of the tribe, Robert Hendricks, during the trial, was that it was expressly set out that way to insulate the tribe from the risks of gaming liabilities. And in this case, there was a significant amount of debt that was incurred because the developer, a Malaysian company named Genting, was funding the massively expensive casino construction project. What does the record show about how the authority was funded? The record shows that there was a developer, Genting, that was funding the project. The record does not reflect, to my recollection, the specific loan documents that were generated through different votes of the tribe. And the members of the authority are all officials of the tribe or not? The chairman and the treasurer of the tribal council to the tribe were on the Gaming Authority automatically, and then three other members were chosen from the tribal council to be members of the Gaming Authority. So would that mean that effectively their salary or their funding in performing those functions are then paid by the tribe? The record doesn't reflect, to my knowledge, Judge, where the salaries for the Gaming Authority came from or whether they were salaries independent of the salaries on the tribal council. What it does reflect uniquely in this case is the complete insulation of the tribe from any risk of liability as a result of the contract with RGV. But why is that particularly relevant to the question of whether the $10,000 amount got to the commission? In other words, if we knew in the record that to fund the operations of the authority, the tribe had given them $10,001, would you agree in that instance that the jurisdictional element would be satisfied? I would think that the case for sufficiency would be stronger. It would be based on an indirect beneficiary theory such as Your Honor addressed in U.S. v. Falcone Neves, where you found that there wasn't proof of the transfer of $10,000 or more of federal benefits. But I would still argue in this case that because the tribe was insulated from any liabilities that flowed from the Gaming Authority to RGV, that the business transaction was exclusively with the Gaming Authority and that these entities were set out that way to completely insulate the tribe and its federal benefits. I guess I am still not following why for purposes of the jurisdictional element does it matter that they're insulated from the liability? Wouldn't be what matters is whether they received funds from the, what is the funds that we're looking at? The $10,000 has to come from where? The $10,000 needs to be federal benefits from grants and programs. That was not disputed that the tribe received more than that. And so if the tribe then gave more than $10,000 to the Gaming Authority, what would be the relevance of the fact that they're insulated from liabilities? I just don't understand. Why wouldn't it just be the Gaming Authority then got them or am I missing something? You know, that's an indirect beneficiary theory because the Gaming Authority did not receive federal benefits directly from the U.S. government. There was no claim here by the government. It's proof that there were even any indirect federal funds that went to the authority. Correct. That wasn't the case tried and the jury asked whether the tribe received the benefits. Yes. The tribe alone received the benefits. There was absolutely no evidence showing that the tribe sent $1 of federal benefits or any significant funds to the Gaming Authority. So what do you do with the general notion that if you think about the casino, if it's opened up and operating, people in ordinary parlance are going to say that's the business of the tribe. The lottery that the state runs through the lottery authority, people would say that's Massachusetts business. How do you say we shouldn't look at that notion of what is the business of the tribe and instead we should break it down and say something is the business of the authority but not of the tribe? Because it was a business transaction that needs to be in excess of $5,000 and the business transaction that was imperiled by the alleged corruption, which we of course dispute occurred, was with RGV and its contract and the contract specifically says this is the business of the Gaming Authority. Sure, but can it also be the business of the tribe who, as I understand it, controls the governance of the authority? It set out the authority to be independent. Yes, I can't dispute that if a casino opened, there'd be benefits to the tribe as well as benefits. Isn't the tribe and the Gaming Authority alter ego of the tribe, even though there's a corporate structure? Because again, it seems to me they're like so linked together. Well, it was set up to de-link the tribe from any liabilities, from any ownership of the assets of the casino and from any liabilities of the casino. That's the testimony of Hendricks. That's the express language of the ordinance, which is either Exhibit 13 or 14 in the record. Is the idea it's no different than any state agency? It is. So if you have a state agency, I thought the fact that you can show federal funds went to a different state agency doesn't matter. It doesn't matter when that was your own decision. And I assume there was no dispute that in the case of like an agency in Puerto Rico, Puerto Rico gets more than $10,000 in federal funding, but nobody thought that was a reason to conclude just from that fact alone that the agency. Yeah, I think the whole goal of 666 in its essentially federally criminalizing the state and local criminal prosecutions and public corruption was to protect federal funds. And in this case, the federal funds exclusively went to the tribe. None of it went to the gaming authority. Unlike Falcone and Neves and unlike the 11th Circuit case in McLean, there's no evidence of any transfer of funds, much less federal benefits from the tribe to the gaming authority. And I think when you look at this contract, which is so explicit that we are not waiving the sovereign immunity of the tribe, that this is only a liability of the gaming authority. That's the business transaction that either was or was not corrupted. I do want to give you a chance to speak just for a few minutes. I mean, I know you reserved three, but since we've directed you to this issue, which you didn't start with about the nexus, quid pro quo evidence. Thank you very much. There's no direct evidence. There's no evidence that Cromwell ever said I'm going to protect the contract. What's the significance of the evidence of them not answering truthfully when asked about the transaction? The testimony of the FBI agent, Special Agent Crandall, it was exclusively an interview four, five, six years after the donations, about the donations, which were acquitted conduct. And when you look at the whole of that interview, Mr. Duquatro is busy volunteering information to the FBI. He is saying to them when he's shown a check, oh, yes, that was a political donation from Mr. Cromwell. He's my friend. I think he's a political leader. He didn't recognize Mr. Mitchell Cox, Mr. Mitchell Costas's name. But when asked about Dino, he volunteered his relationship to Dino. There's simply in context, you know, very little inaccuracies in Mr. Duquatro's statement. He had no threat against him like there was against Mr. Beretta of a thousand and one prosecution. And it was generally characterized by openness. Mr. Duquatro said, I'll go find the records. Yes, I think there was over forty thousand dollars of political donations. But there was no false statement regarding the gifts. And there's no evidence in the record of Cromwell saying anything about the contract at any point? No evidence of Mr. Cromwell's ever saying anything about protecting the contract. Mr. Duquatro's business partner is immunized. He testifies that Mr. Duquatro never said more than Mr. Cromwell requested a donation. We have the text of the request for the hotel suite. It doesn't come with a threat. It doesn't come with a promise. And we have the government relinquishing the stream of benefit theory that has upheld some of the other convictions on public corruption cases. Here we have no pattern of official benefits flowing to Mr. Duquatro from which you can infer that there was some exchange, even if it was by a wink and a nod. We have the proof that the government has agreed it was required to make eight separate transactions. On Appellate Brief 31, they agree and have principled that they had waived and not sought a stream of benefit theory, that instead they have the burden to prove that eight separate transactions were a quid pro quo exchanges. Six of them were acquitted and the two gifts were such a modest value. It's really no different than Mr. Cromwell asking for NBA playoff tickets. These were not outrageous, expensive gifts. As a practical matter, in almost all these cases, isn't the quid pro quo going to be implicit? I mean, it's a rare official who would say, all right, here's the quid, here's the quo. I'll do this, you do that. Instead, they're giving a benefit. The person is applying for something and they said, I need a weekend at the seaport with my special guest. You pay for it. And the hearer of that saw that as affecting the business because he went back and spoke with his business partner. Didn't tell his business partner that, hey, Mr. Cromwell's threatening the contract or he's promising to protect it. And even if he didn't, Mr. Quattro never asks for anything. I know that's not conclusive. But when you put it in context, these two gifts were given 28 and 36 months after the contract began. Nobody is complaining about the performance of RGV. The gaming authority members are saying we loved RGV. The treasurer who voted against them said I had a great relationship. They were at the epicenter of the contract. The contract didn't need protection. So unlike other cases where there's a provable benefit that's flowing to the donor, here there's not. And the context doesn't provide any influence. The other cases have been instances in which the gift preceded, claimed gift, preceded the ask. Is that right? The unusual thing here is that the gifts are after the contract was forged. And so you just have to then intuit if he didn't keep giving the gifts, he knew he could lose the contract. So he was basically paying him to stop him from doing that. The more typical scenario is I want a contract. Before I get the contract, I give you lots of things. Then the person does something a little bit funny and you get the contract. And then we infer, well, it must have been understood that that was an exchange. This is not that scenario. There's no evidence that Mr. Cromwell asked for anything of Mr. DiQuatro before the five members of the gaming authority made RGV the lead candidate by a 5-0 vote, remembering RGV had just finished performing a separate project for the tribe, the building of the government center, which the members of the gaming authority said they were very proud of, happy. RGV was loyal to the tribe's program of trying to put to work tribal members. In other words, their beef with the prior owner's rep was that he was loyal to Zhen Ting, the developer. He was not loyal to the tribe. Now we have 28 months later, there's no problems. Nobody is raising issues with the performance of RGV. So I don't think you can infer either that this was a reward for the selection of RGV. There were principled reasons why RGV was selected. And even if it was, and I suggest the evidence doesn't show that, that's the issue that the Solicitor General was arguing before this U.S. Supreme Court two months ago and Snyder, which will come out this month, where they're seeking to expand 666 to include a case where the official does something for a business and thereafter seeks a reward without an antecedent promise. Is that theory in the case, in other words, if Snyder comes out in a way that would make the reward fall within 666, is that relevant to this case? No, it's not, because it was prosecuted under an indictment that required an exchange. Okay. Instructions required an exchange. Thank you. Thank you very much. Thank you, counsel, at this time. Counsel for Mr. Cromwell, please introduce yourself on the record. Good morning, Your Honors. Robert Hennessey on behalf of Cedric Cromwell. It has been nearly four years since the government indicted Mr. Cromwell on charges of federal programs, bribery, Hobbs Act extortion, under color of right, and conspiracy. The government's case by the time of trial settled on the theory you've already heard about, which is that each of a number of monetary transactions and gifts provided to Mr. Cromwell by Mr. DiQuadro was solicited, given, and accepted as part of a discreet, corrupt quid pro quo agreement in exchange for Mr. Cromwell's performance or agreement to perform specific official acts to protect the contract from some unspecified harm. We are asking this court today to find that there was insufficient evidence to permit a rational juror to find, beyond a reasonable doubt and without undue reliance on speculation and conjecture, the existence of any quid pro quo in relation to any of these gifts or things of value, and for that reason to order the entry of judgment of acquittal on all counts. We make this argument with the understanding that appellate findings of evidentiary insufficiency in criminal cases are uncommon, but this is factually an uncommon case. Despite pursuing a theory of protection, the government's evidence at trial failed to induce in any way that Cromwell took a single affirmative non-ministerial official act in favor of Mr. DiQuadro or his company, or that the contract in question was at any point in any particularized peril. More broadly, the trial evidence failed to show that Cromwell even once, directly or indirectly, implicitly or explicitly, agreed, promised, threatened, or insinuated an intent to perform any official act, either in favor of Mr. DiQuadro or adverse to Mr. DiQuadro if any of these requests were declined. There's not a single communication that was presented as evidence, and no witness, including the immunized witnesses in this case, claimed to have a belief, let alone knowledge, of such an agreement having been made. When he asked for the exercise equipment, you have to ask, why did he pick this fellow to ask? And then when it was delivered, he didn't treat it like it was some birth ticket from a friend. He started actually complaining that it wasn't nice enough. Does that shed any light on the nature of what was going on? I mean, this wasn't him calling up his uncle and asking for something. Sure. Well, I would say it was calling upon someone who the evidence established was a close friend of his. Mr. DiQuadro had attended multiple family gatherings, including a ceremony surrounding the death of Mr. Cromwell's mother. But didn't he act like he was entitled to it? Well, the evidence would suggest that there was some statement of disappointment in the fact that this was a use rather than a new item that came out there. But I really don't think that that disappointment may be impolite. But I don't think it supports an inference of duress that would suggest that the reason that the Bowflex was given at all was because there was some understanding or belief. Why is he asking for these things? Well, with the Bowflex in particular, the reason he's asking for is because he had just completed surgery. No, no. That's why he wants a Bowflex. Why is he asking this person to give him a Bowflex? Because he's a close friend of his. I mean, the evidence establishes that he is a friend, a close friend, and a business associate. Is there any evidence that he generally asked friends for stuff like this, weekends at the seaport, Bowflexes? You know, and I would defer to Mr. I joined him in some of Mr. Weinberg's arguments regarding some evidence that was excluded in this case. And I think that that type of evidence was excluded by Judge Woodlock. I didn't join in the arguments about that particular exclusion. So there was no other evidence presented at trial. But there are arguments within the briefs about why maybe such evidence should have been presented or could have been presented. Counsel, as to the jurisdictional issue we asked, co-counsel, you're in agreement with what he said? Yeah, I joined in. I believe that with respect to the 666 charges, the jurisdictional element, if it were found to be insufficient, would require the And that would take care of everything else then? It would take care of all the 666 charges. But not the Hobbs Act? But not the Hobbs Act charges, which my client was initially convicted of but then ultimately acquitted by the trial judge on those counts. So do we need to decide anything with respect to your client other than the jurisdictional element if we were to rule in favor on you on that element? Yes, you would have to affirm either A, affirm the judge's dismissal of the Hobbs Act charges. On the cross-appeal, I see. Yeah, so that would be the other issue, which I would be happy to turn to now. It actually bleeds significantly and sort of continues with respect to the sufficiency of the evidence with respect to quid pro quo, which is, as the courts are aware, also an element of the Hobbs Act charges. So, again, the failure of the government's evidence to identify or a single communicated understanding between... I'm just trying to think of how these issues in this case all relate to one another. Is the quid pro quo issue with respect to the evidence on the Hobbs Act counts any different than the sufficiency questions about the quid pro quo with respect to the 666 counts? I don't think the sufficiency of the evidence arguments are all that different. The one difference is that the jury actually acquitted both defendants on the conspiracy charges addressing the first three transactions and then convicted Mr. Cromwell of the conspiracy charge, which involved those first three transactions. So, in a sense, it extends to more transactions than just the 666 because three have been removed by the jury's acquittal. But I think the arguments are the same because this lack of any communicated understanding between these two men extends throughout the entire period of this contract. There is never, in relation to any of these, a communicated understanding connecting these gifts in any way to any action involved in this contract. And this absence of evidence puts this case in stark contrast. So I think nearly every case cited in the government's brief for the proposition that sufficient evidence was present. There's the McDonough case, which has evidence of informant testimony. Evans talks about videotaped solicitations, and it goes on and on. It's cited in my brief. Let me ask you one question about the Hobbs Act also. Let's assume, irrespective of whether you prevail on the facts, that there's no Hobbs Act claim. Judge Woodlock, he said basically there's no Hobbs Act because this doesn't apply to tribal officials. That's your position as well? Yes, I make an argument in my brief as to why that that was not error. I think that argument turns—I mean, there's precious little case law on this particular issue. It is striking—I didn't realize until I read this case—that there is not a single appellate decision in the history of the decades-old Hobbs Act in which a native leader was charged and convicted and that conviction was upheld under a theory of official right. Well, for example, the analogy—and I think the government makes this—is state officials can be charged with the Hobbs Act. Why can't the tribal leader be charged with the Hobbs Act? Yes, so, I mean, if I may answer your question, part of what I argue is the ambiguity that's going on here is that the Hobbs Act doesn't define undercolor of official right. It just incorporates that common law term. It has—you can affect interstate commerce by extortion. It defines extortion to include acting under official right, but it doesn't further— So who does it exclude, in your view? In my view, it excludes members who—leaders—it excludes people who are beyond the polity of what is within the court—within the Congress to regulate. I thought the district court simply relied on sovereign immunity and the clear statement rule. Well, I mean, the district court did discuss that as well, but it also cited a case that was a predecessor to the current version of 666, which is cited in our brief—I think it's Farquhar—in which it was a statutory construction case prior to an earlier version of 666. Is the non-sovereign immunity-based argument that you're running to us for affirming on an independent ground an argument that was raised below? Yes, yes. The nub of the argument is that Native American leaders like Mr. Cromwell do not constitute public officials within the meaning of the statute. And that was raised below for reasons independent of a claim of sovereign immunity? Yes. My understanding of the briefing—and it is in the record that was raised by trial counsel, which was not me— I mean, the Coughlin clear statement, all of those cases were raised as persuasive authority to this is another reason to construe the statute this way. Since you've raised Coughlin, which I'm somewhat familiar with, how does the fact that Coughlin came out saying tribes were included in the list that said other domestic governments bear on the question of whether— Well, I think it said—and correct me if I'm wrong—I believe it said other domestic and foreign governments, right? And then it held that it was a domestic government, I think. I would have to— Well, at least it sort of covered the waterfront of all governments. So why wouldn't public officials cover anyone exercising public authority of any kind? Because I think that— Because tribes are not? I'm sorry? Tribes are not exercising public authority? No, our argument is that they are not because that they are not selected as part of the polity of either the United States, the state, or Mesa Valley. They're selected by tribal members who are selected by lineage, et cetera, et cetera. It's simply just not a public entity in the same way that would render one a public official and therefore subject to prosecution under the Hobbs Act. Anything further? Thank you. Thank you very much, Your Honors. Thank you, counsel. At this time, counsel for the appellee cross-appellant in the United States, please introduce yourself on the record to begin. Good morning. Please support Karen Eisenstadt for the government. Unless the court has a different preference, I'd like to first touch on the two cross-appeal issues on which government is the appellant, minus the sufficiency challenge to the Hobbs Act, which then I'll just discuss along with 666. So the district court erred in granting the judgment of acquittal on Cromwell's Hobbs Act convictions. The court reasoned a clear statement is needed for the Hobbs Act to apply to tribal officials due to tribal sovereign immunity. And for the reasons stated in the government's brief, that's not correct. Tribal sovereign immunity does not apply in this context for the same reason state sovereign immunity doesn't bar Hobbs Act prosecutions of state officials. And Cromwell offers no counter-argument directly on the sovereign immunity point. What about the point that public official or official right is potentially ambiguous as to whether that encompasses a tribal official? Right. So he argues the issue that you were just discussing with counsel as an argument for affirmance on alternative grounds. It is an argument, I know you've asked this question, that he did raise in some form before Judge Willock, who rejected it. The problem with his argument is he's trying to turn the rule of lenity into an effective clear statement rule. So somehow it's ambiguous because it doesn't clearly state that tribal officials are covered. But that sort of turns the rule of lenity on its head. So I guess just skipping that point, how do we know official right, which has been construed to mean public officials, encompasses tribal officials? I think when you look at the common law history of the offense, there's nothing in there that indicates there's a limitation other than we're looking at governmental officials, people who are working for a government. And as the Supreme Court said- Whether they're elected, appointed, or by inheritance, tribal, they would all apply in your position. Correct. I think one fact that's helpful in that regard is that this does come from English common law and then is imported into American common law. There isn't sort of any concern that English polities or governments, they have different structures than American governments. It just applies to governments, and that's what a tribal government is, according to the Supreme Court in Coughlin. So there doesn't seem to be any barrier to applying it. And the idea that a tribe is not a polity or not a public doesn't make any sense, because they are a sovereign. They're themselves a special polity, and so there's no reason to exclude them from the general understanding of what a public is. So if we excluded them, basically anybody who's in the state could be prosecuted, anybody who's in a territory could be prosecuted, it would just be the ones, individuals in the Indian, member of Indian tribe could not be prosecuted. There'd be like that exception. Correct. That's what Mr. Cuomo is arguing for, that there's somehow an exception for tribal leaders, which would then leave tribes unprotected in this way. I think when we look at the public official sentencing enhancements, there it's the same issue that the district court was relying on tribal sovereign immunity. It doesn't work for the same reasons, and there the idea that the tribe doesn't qualify as a public, we also need to look at the commentary that defines public official in the guideline, and it's just extremely broad. I think in the same way in Coughlin the bankruptcy code defines government extremely broadly. There's an intent. It's not expressed, and I'm trying to think of another instance where we found a federal statute to include a crime by a tribal member against the tribe without Congress having clearly indicated and intended to encompass that, or even on tribal land, McGurn. It seems there's a presumption that if Congress wants to legislate activity by one tribal member against the tribe, it's pretty express. So McGurn, I think, is dealing with a unique situation. So that case concerned the Major Crimes Act, and in discussing this issue, they're citing ex parte Crow Dog, which was the case that led to the enactment of the Major Crimes Act. When you look at that entire line of case law, the point is that these are situations where the federal government has the power to legislate because it's federal land. So it's sort of, if you look at the General Crimes Act, that's 18 U.S.C. 1152. These are federal enclave laws. Basically it covers territory, special maritime jurisdiction, and then they extend it to Indian country. So the issue here that they're wrestling with in McGurn is that, you know, it's federal land, and the Congress does have the right to legislate these things, but it's also Indian land. I mean, there's tribal rights and there's treaties in place, and thus, I think what you're referring to, Judge Kean, that we're looking for something more than just we're going to infer it applies because it is federal land. It's a special character of the land that being also Indian country. But that doesn't apply when we're dealing with federal criminal laws of general applicability because those are not based on Congress's power over the land. It's based on other congressional authority. So it applies anywhere it's violated. So this is the Commerce Clause. That's the same authority that was used to enact the Wire Fraud Statute, which was the one at issue in Boots. So that's what is the authority under the Hobbs Act. And if you look at the Commerce Clause... Is there any other statute that, criminal statute, where I take it there are criminal statutes that specifically mention tribes? 666 does, for example. Right. So why does it do that? So 666, this was the District Court's reference to the Barquin case. So what had happened was 666, as originally enacted, did not mention tribes, but it had a list of officials covered, state, local, et cetera, and I think agencies of the same. So the Barquin Court came in and looked at that and said, generally we would say federal laws of general applicability apply equally to tribal members because that's the rule, the backdrop that we would look at. And this is a federal law of general applicability. It's not sort of land-based. However, if Congress is undertaking to specify and enumerate who's covered and they don't put in tribal officials, I mean, we cannot but conclude that they're not covered. So that was what the Court found in Barquin, and in response Congress amended 666 to specifically add to that enumerated list tribal officials. So I think what's going on there is just an issue of ordinary statutory interpretation, that if you're going to list it and you leave them out, we can assume that you didn't mean to include them. If I follow, the logic would be something like this. If instead of the Hobbs Act saying under official right, it said under government right, you would say there's no reason to read government to exclude tribes, right? Correct, yes. And so then official right has then been construed to mean public officials, and you're saying it's really just a synonym for a government official. Correct. And so there's nothing about that term that on its face would exclude the tribes, so there's no ambiguity. That's the basic logic? That is the logic, correct. Those things have been all construed to be, that's what it means, a governmental official, tribal governmental officials are governmental officials. That's the logic. You want to address the quid pro quo evidence? Yes. So as to the sufficiency issue, we're dealing here with a particular pattern of requests and payments, and I think the pattern is meaningful. We have D'Amato, RGB's predecessor, being booted out, and RGB comes in, and there's evidence that Cromwell orchestrated, not he can't do it himself because they have to vote, but he orchestrated both moves. He's highly influential. I think we can tell based on his reputation in the tribe, his national reputation. He's the chair of the tribe, and also he's the one who deals with the owner representatives, so there's testimony that the other members of the board didn't really deal directly with D'Amato or RGB except in the context of the meeting. So to the extent there's an issue raised about the owner's representative, that's got to be coming from Cromwell, and that's where the evidence shows this sort of idea of dissatisfaction was emanating from him. After RGB starts billing on this lucrative contract, Cromwell comes to the quadrant, asks him for $10,000. He wants it through a check without RGB's name on it and made out to what is obviously a sham entity, which is at that time not even operational. Let me ask you the thing that is concerning me. If I read McDonald and all those cases, they're basically saying governor comes to you, you have business before the governor, and says, you know, I'd like some things. And the court seems leery of saying just because obviously the public official has all kinds of ways in which they could benefit the person giving the gifts, we can't just say because the gift was given or even because the gift was asked for. That's a quid pro quo exchange unless there's some tie to some specific thing that's being asked for in exchange, which we can infer. And my worry is here in this evidence, Cromwell obviously has some authority over this person in a sense. He's got a contract. They have an ongoing contract. But the logic of it seems to be just because of that alone, any time a gift is then given or asked for, we just know it's in return for an official act and the official act must be so I don't terminate the contract. And that seems just against the grain of where all these precedents are suggesting we go. What's your answer to that? So I disagree that it's purely just that there is a contract and payments are given. So as I just mentioned, RGV got this contract because their predecessor was pushed out by Cromwell. So a rational jury applying common sense can look at this, Cromwell coming to De Quatro. It's still the idea though is then, you know, there is a whole story as to why the last person lost the contract. There's no evidence that he lost the contract because he didn't give gifts, right? Correct. And no indication that he would have thought the reason you lose the contract is if you don't give gifts. So any successor to a prior contractor, if they give a gift to the person who gave them the contract, they're at risk of a criminal prosecution. I mean, that's the whole theme of all these cases from the Supreme Court is we're worried about creating that situation. And so what is in this record that would lead one to think, well, don't worry about that so much. There's more here than that. And following that question, I assume the government's case is based on circumstantial evidence. Correct. It's a circumstantial case, yes. And if it's circumstantial evidence, it goes to the weight of the, you know, credibility, weight of the evidence the jury's brought in. Correct. So we're looking at whether a rational jury could infer these things. So what makes this case apart, I think, is acts of concealment on both sides when they make these payments. I think you mentioned earlier, you know, the jury's entitled to find that when De Quatro are lying and obfuscating. And in addition, I think we're not looking at one payment. What we're looking at is a pattern. Cromwell does this and De Quatro does this over and over again, and they do it solely during the life of this contract. It doesn't happen before, although they're friends and so forth before. It doesn't happen after, although they remain friends presumably after, only during the life of the contract. And actually, when you look at the request, they're timed in such a way that they're paralleling sort of the going forward value of the contract. So at the start, contract is proceeding apace. RGB is billing well. He's coming back every few months to ask for another $10,000. Then there's a gap between the fourth and fifth check. That's the longest gap. I think it's like eight or nine months. That's when they're waiting to see if the Department of Interior is going to come through with the land and trust designation. If they don't, the whole project's off. When it finally comes through, it's like two days later, Cromwell's back. I want another $10,000, and that's the fifth check. Then when there's the Thompson litigation where, you know, now there's some litigation risk, they're challenging the land and trust designation. Is the thing going to be off? RGB's told slow down because we don't know where this is going, but they're hopeful that they'll overturn it. Then Cromwell's back but making more modest requests. He wants the Bowflex. He wants the hotel stay. Then we also see how DeQuatro and Beretta are discussing those. They're thinking of them in the same vein as the checks that they've already paid. We see Beretta saying, well, I'm not buying him a new Bowflex. The inference being, I already gave this guy $50,000, and now he wants a Bowflex? I'm not buying him a new Bowflex. And then DeQuatro's own words when the hotel stay request comes through to Joe Beretta, you can't think of this stuff. What's next? You've got to be kidding, is the response. So when he says what's next, they're thinking of these things as Cromwell coming back to the well over and over again. There's no doubt that evidence supports the idea he wants to be in good graces with Cromwell. He doesn't want to disappoint him. The question is, and this is true in McDonald and all those cases, we don't just give the call set to the governor you just met. I mean, maybe you do, but I don't know why you would do it unless you want to curry some favor with the person. But it's got to be in exchange for a specific thing, and I think the contention is what would lead the jury to conclude it must be in exchange for the protection of keeping the contract rather than I just got a $5 million contract from this guy. There's just no end to what I could get from him the next time. So how do we not know it's just making sure I'm in good graces with him when I go for the next contract? Right, so I think there's a couple things on that point. One, in terms of being gratuity, the timing I think is relevant, and the fact that after the contract's over, it never happens again. I mean, presumably they still want further business, but they never do it again, and he never asks again. In addition, I think when you look at the sheer amount of what he's asking for, this isn't like a tip. He's asking for $10,000 at a time, and he does it five times, and then he's still asking for more stuff. And again, this is paralleling the life of this contract and nothing else. That's the only thing that's unique to this timing. Should we also consider the contract? I believe what RGB got overall was about $5 million. It started slower, but then it – is that indicative also, based on the amounts the defendant is receiving, that something's going on? Because again, it's a huge contract. This is not like a $10,000 contract, and you get a couple little things. Is that helpful to the government or not? Yes, well, I mean, it's obviously something worth protecting for RGB. It's an enormous contract, and as you look at the sort of promos, requests, and the payments, they're paralleling sort of the life and value, going forward value of this contract. No such requests happen, and no payments happen before or after the contract, only during the contract. And again, just currying favor for future business, you would do that at any time. I mean, it's still a source of future business. There's nothing. I believe the evidence showed that the contract, for purposes of RGB, was worth a fifth or a fourth of its income over the years, correct, something like that? Yes. So in terms of for RGB, it was their biggest contract, so it was very significant to them. So a company has a big project pending before the state, looking for state approval on something. The governor calls the head of the company and says, I'd like X thousand dollars for my election campaign. The person's going to have this same thought pattern that you say would hear, which is we're waiting to get this discretionary decision from the state, so we better say yes. Would those facts be sufficient to bring a charge? Well, I think there's a couple differences. So that would be a campaign contribution, which I think the evidence was more than sufficient to find that none of these were campaign contributions, and that everyone knew that the entire time. I mean, given sort of the nature of tribal campaigns, it's not plausible that they were campaign contributions. I believe in your brief you mentioned tribal campaigns, 2,000 contacts. They're very, you don't need these huge amounts of money. Correct. So, I mean, it's a very small tribe, and they basically, most of them are related, and they all know each other. So it's not sort of like a massive election campaign like you'd have for the state. I think another difference with the hypothetical you're positing is that here, again, D'Amato was terminated right before RGB comes in. So the question is when Carmel comes to them after all of these things in the context of that having happened and says, I want $10,000, is this essentially extortion slash bribery? I mean, what does he mean when he says that, and what is he trying to convey? And I think when you look at the totality of all the evidence, it's sufficient for the jury to find a quid pro quo as to each of the convictions that they found. So the jury didn't convict on everything, and I think that is indicative of some of the concerns your honors are raising, that like early in the pattern, how can we be sure De Quatro understands what's going on, et cetera, but they convict on things that happen later in the pattern, where it's happened multiple times already, where we have actual direct evidence of De Quatro and Beretta and what they're talking about with respect to the payments. So I think in terms of what convictions are left to defend, when you look at all the evidence together, it is sufficient to draw the inference. It's not, I would say, a case of overwhelming evidence, but it is sufficient. On the issue of the government's business under 666, as I read the government's position, it essentially for virtually all purposes merges governmental agencies with the overarching government itself by saying that any business of the agency is a business of the government. Am I misreading the government's position? I don't think that's the government's position. That's much broader. How would you distinguish agency business that is the government's business from agency business that is not the government's business? I think here, because he's making it a sufficiency claim, his position, if I may continue, his position is that the limited liability entity is dispositive. Like, this can't go to the jury. There's no factual dispute. I mean, it is in the contract. The government's position is it's not dispositive, and that's really all we're saying. What's the evidence that the money went to the commission? Does it have to be any evidence that money went to the commission? That's not the theory the government has. It's not an indirect funding theory that the money is being then passed on to the commission. It's just a theory that the casino project is the project of the tribe. It's the business of the tribe, and that was the question posed to the jury. So can you give examples of agency business that you would not say is government business? I think we're looking here in a specific context. So this is a tribal government, and they have a single sort of subsidiary that they created just for this gaming business. We have evidence about how, you know, from members of the tribal council, how they thought about that, et cetera. We have evidence that the gaming authority was created by the council under its power to establish procedures. I'm still not hearing under your theory any single example of any agency business that you would not say is government business. I think it's different because here we're saying the jury, a rational jury, could conclude. And why not with an agency? Suppose you have an agency that gives grants. So it's different. I think one thing that is being lost here is that this is not a preexisting, the gaming authority is not a preexisting agency. It's created when Cromwell is chairman. So he leads the creation of this agency. And he does so in such a way that under the ordinance, he's automatically going to be the leader of this agency. So he does that. And I think the question here then is really, is it that you can evade 666 liability by creating a structure like that for that purpose? I think that's the question that the jury can think about here. Is it really separate or can we look at the substance of what's going on here? And I think it would be different if it's a preexisting agency and the defendant wasn't involved in its creation, et cetera. But here the facts are that he was. He basically — You're not suggesting that this authority was created for the purpose of facilitating bribery. The record seems very clear. They had an obvious other reason, perfectly straightforward, for creating an authority to handle gambling. Correct. So that's correct. It's for limited liability purposes. And that preexisted any of the solicitations that you point to. That's correct. But I think the difference here is that if the court were to find that you can create an entity and thus insulate yourself from 666 liability, it's essentially allowing people to contract around 666 liability because they can't look to substance. Take the agency in the Puerto Rico case we recently had. The thing was because of the AAA. It gave out contracts, right, or grants. It was created for independent purpose to create grants and things, just like this was created for independent purpose to have limited liability in building a casino. Correct. The government wouldn't take the position that any money that went to Puerto Rico would count as money to AAA. It didn't even argue such a thing. No. So why is that? So that's just Judge Gatto's question. Why is that agency, which gives out money, any different than this entity, which was independently established for a reason that's legitimate, different with respect to 666 and the way the money runs? So there's a couple differences. I don't think the government would ever argue money received by one arm of the government leads to liability for some separate arm of the government. So it's not like the whole government is one monolithic thing for purposes of 666 liability. Here we're looking specifically at sort of going up to the parent, I guess. And I don't understand how we could say that corporate separation is dispositive under 666. It's not even dispositive for commercial liability purposes. I mean, this is challenged all the time in damages cases, whether the distinction is just formal or if there's substance to it. And here in a criminal context, I mean, where the statute doesn't tie itself to that particular, linguistically to that particular distinction, I don't see how it's tenable to say that what would not even be dispositive if someone sued the gaming authority and wanted to reach the assets of the tribe is now dispositive when we're dealing with criminal liability and whether you can insulate yourself from that by creating entities or writing limited liability clauses. So you really think Congress was thinking state governments, tribal governments, people in them might go out, create some governmental agency, like how? Through legislation, presumably, and do that for the purpose of making bribes that they would then be insulated from? That seems rather, it's hard to imagine that that was in Congress's mind. I don't think necessarily Congress anticipated that, but I think they wrote the language broadly so that it would capture sort of any types of shenanigans in this way. In the same way, you know, the definition of agent is broad, so you can't just say in a contract I'm an independent contractor, not an agent, and then suddenly not be an agent for 666 purposes. It's a question of substance in addition to form. I don't think you can see in the language of 666 anything that sort of tethers it to form rather than to substance. Thank you. Thank you, Counsel. At this time, Attorney Weinberg has a three-minute rebuttal. Thank you. In terms of the jurisdiction argument, the 11th Circuit has two precedents to random acclaim in each case, a separate entity that was created that didn't receive $10,000 or federal benefits resulted in reversals of those convictions. There's simply nothing here. The ordinance in Section 5 says that the gaming authority is created as a separate and apart from the law. That's the language of the ordinance. Second, in terms of the quid pro quo issue, the evidence here was very strong that Mr. DiQuatro and RGB had a business motive. Exhibit 122 sent by Mr. Cromwell on June 30, the day before his first request for a donation, sent to Mr. DiQuatro an article about tribal opportunities, business opportunities with other tribes. Mr. Beretta, the immunized government witness, said Mr. DiQuatro talked about Mr. Cromwell's talking about future business development opportunities, that they had another opportunity. Third, you had the practice of RGB with business development, handing out gifts and donations to pending clients like Johnson & Wales and other schools in amounts that equaled or exceeded the amounts that are at issue here. Chief Judge Barron set out the test in Falcone Neves that I submit is not established by the government's inferential evidence or pilings of inference upon inference in this case, which is if the evidence is equal or nearly equal between theories of guilt and theories of innocence, then there necessarily must be a reasonable doubt. And here there is simply no evidence submitted in support of the single criminal motive, bribery, that exceeds the evidence that was submitted in terms of a benign or non-criminal intention for these gifts. That puts aside the fact that the jury acquitted Mr. DiQuatro of the donations. It puts aside how different the donation evidence was. There was no concealment of gifts. It was given on an RGB Amex credit card. Mr. DiQuatro went to Mr. Cromwell's house to try to set up the equipment. Even the donations, there were checks from Mr. DiQuatro personally. There simply lacks in this case the kind of circumstantial evidence, a pattern of benefits, any benefit, any request for a benefit, any lack of alternative reasons for giving the gifts, that an extension of 666 to the facts of this case would really step into what businesses do with clients, which is they give gifts, and it may not be pretty, and sometimes the gifts may be asked for by clients, but it is simply not a federal crime. And I urge you please to vacate the conviction of Mr. DiQuatro on count five. Thank you very much. Thank you, counsel. That concludes argument in this case.